In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-1890

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AUSENCIO MARTINEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 21-cr-20066-001 — **Colin S. Bruce**, *Chief Judge.*

ARGUED SEPTEMBER 3, 2025 — DECIDED JULY 7, 2026

Before SCUDDER, KIRSCH, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* In the early morning hours of October 7, 2021, Illinois State Police Trooper Anthony Muzzillo received a tip that a semitruck was hauling a large amount of narcotics north on Interstate 57. Muzzillo, a K9 handler, enlisted help from another K9 state trooper and they waited on the side of the highway for the truck to pass. Upon spotting the semitruck, Muzzillo pulled the vehicle over to conduct an administrative inspection pursuant to Illinois's commercial

trucking regulatory scheme. As the stop unfolded, Muzzillo eventually conducted a dog sniff, which resulted in a search and discovery of narcotics. The driver of the semitruck, Ausencio Martinez, was placed under arrest. After the district court denied his motion to suppress, Martinez entered a conditional plea to possessing with intent to distribute five kilograms or more of cocaine. 21 U.S.C. § 841(a)(1), (b)(1)(A).

On appeal, Martinez challenges the constitutionality of the traffic stop, arguing it was a pretextual administrative inspection in violation of the Fourth Amendment. For the reasons that follow, we reverse and remand for further proceedings.

## I.   BACKGROUND

### A.  Factual Background

Early in the morning of October 7, 2021, Illinois State Police Trooper Anthony Muzzillo was called out to assist another (unspecified) law enforcement agency about a semitruck transporting narcotics. Muzzillo, a K9 handler, was not on routine patrol that night, so he enlisted support from Trooper Krol, another K9 handler with the Illinois State Police.

Based on the law enforcement tip, the two K9 troopers staked out a spot on Interstate 57 for at least thirty minutes waiting for the semitruck. At 3:16 a.m., Muzzillo located Martinez's semitruck driving north on the interstate in Kankakee County, Illinois and pulled it over. Muzzillo testified that he decided to stop this particular semitruck because it was "possibly carrying large-load narcotics." The stated purpose of the stop was to conduct a Level 3 administrative inspection, which entailed checking Martinez's driver's license, the

truck's logbooks, insurance documents, and registration documents.

When approaching the truck, Muzzillo noticed an "overwhelming odor of air freshener," which he understood to be commonly used to mask odor from narcotics. He asked Martinez to follow him to his squad car for questioning while he reviewed Martinez's documents. As they spoke in the squad car, Muzzillo perceived Martinez as being "extremely nervous," having "dry mouth," and breathing "heav[ily]."

From the logbooks, Muzzillo learned that Martinez took a 300- to 400-mile detour from his delivery route. Martinez explained that his company had rerouted him but then decided against the new route. Muzzillo also noticed that the semitruck's bill of lading indicated the load Martinez was hauling had been sealed previously, but that seal had since been removed; this created the risk that the shipment's receiver would reject it. Finding these observations suspicious, Muzzillo conducted an exterior dog sniff of Martinez's semitruck. The K9 alerted Muzzillo to an area near the driver's door.

Muzzillo then communicated the alert to a member of the law enforcement agency that had provided the tip and who was also present at the stop. In response, law enforcement requested Muzzillo search Martinez's semitruck based on the K9 alert. During the search, Muzzillo discovered a duffel bag filled with suspected narcotics. Muzzillo then handed the criminal investigation off to the originating law enforcement agency.

## B. Procedural Background

A grand jury returned an indictment charging Martinez with possessing with intent to distribute five kilograms or

more of cocaine. 21 U.S.C. § 841(a)(1), (b)(1)(A). Martinez moved to suppress the evidence derived from the warrantless search of his semitruck. Relevant here, he argued Muzzillo violated his Fourth Amendment rights by using the Illinois administrative inspection statute as pretext to investigate alleged criminal activity and by unreasonably prolonging the stop to conduct a dog sniff. In response to the suppression motion, the government argued that Muzzillo's subjective intent was irrelevant to whether he lawfully stopped Martinez for an administrative inspection. The government also contended that Muzzillo had independent reasonable suspicion to extend the stop for a dog sniff.

The district court held an evidentiary hearing on the suppression motion. Muzzillo testified at the hearing. The court also admitted multiple explanatory exhibits and a video of the traffic stop.

Following the hearing and after reviewing the parties' post-hearing briefing, the district court denied Martinez's suppression motion. It rejected Martinez's contention that the stop's constitutionality turned on Muzzillo's subjective intent. The district court recognized that under *City of Indianapolis v. Edmond*, 531 U.S. 32, 45–48 (2000), an administrative stop could be challenged on the basis that the administrative program itself was enacted with a pretextual programmatic purpose of aiding criminal investigations. But, the court reasoned, *Edmond* and *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983), barred defendants from contesting the constitutionality of that programmatic stop by challenging the subjective intent of the individual officer who conducted the inspection. From this, the district court concluded the stop was justified at its inception because there was no

dispute that Illinois law authorized Muzzillo to conduct an administrative inspection. The district court also rejected Martinez's argument that the dog sniff unreasonably prolonged the stop.

Martinez conditionally pled guilty to possessing with intent to distribute cocaine, reserving his right to challenge the denial of his suppression motion. The district court sentenced Martinez to 120 months' imprisonment. Martinez now appeals.

## II.   ANALYSIS

Because a district court's denial of a motion to suppress involves mixed questions of fact and law, we review factual determinations for clear error and conclusions of law de novo. *United States v. Avila*, 106 F.4th 684, 692 (7th Cir. 2024).

On appeal, Martinez maintains his contention that the traffic stop of his semitruck exceeded the constitutional bounds of an administrative inspection because it was mere pretext to conduct a criminal investigation, and thus the district court erred in denying his motion to suppress.[1]

### A. Purpose for the Stop

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be vio-

---

[1] Martinez also argues that even if the initial basis for the stop was lawful, Muzzillo unreasonably prolonged the stop by conducting a dog sniff without reasonable suspicion of criminal wrongdoing. But for the reasons explained below, we need not reach this argument.

lated, and no Warrants shall issue, but upon
probable cause, supported by Oath or affirma-
tion, and particularly describing the place to be
searched, and the persons or things to be seized.

U.S. CONST. amend. IV. A traffic stop is a seizure within the
meaning of the Fourth Amendment and is "thus subject to the
constitutional imperative that it not be 'unreasonable' under
the circumstances." *Whren v. United States*, 517 U.S. 806, 810
(1996). The essential purpose of the "reasonableness" stand-
ard is "to safeguard the privacy and security of individuals
against arbitrary invasions" by law enforcement. *Delaware v.
Prouse*, 440 U.S. 648, 653–54 (1979) (citation omitted); *see also
United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

To be reasonable, a traffic stop must be "justified at its in-
ception." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021)
(en banc) (citation and quotation omitted); *cf. New Jersey v.
T.L.O.*, 469 U.S. 325, 341 (1985) (collecting cases "recogniz[ing]
the legality of searches and seizures based on suspicions that,
although 'reasonable,' do not rise to the level of probable
cause"). Typically, assessing reasonableness under the Fourth
Amendment "is predominantly an objective inquiry." *Ash-
croft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *Edmond*,
531 U.S. at 47). Under that usual assessment, where the objec-
tively viewed circumstances justify the initial stop based on
individualized suspicion of criminal wrongdoing, the Su-
preme Court instructs that action is reasonable "*whatever* the
subjective intent" motivating the relevant officials. *Id.* (em-
phasis in original) (quoting *Whren*, 517 U.S. at 814).

In this case, however, the government does not seek to jus-
tify the initial stop of Martinez's semitruck based on the ob-
servation of a traffic violation or probable cause of criminal

activity. Instead, the government argues Muzzillo's actions were justified by Illinois's commercial trucking regulatory scheme, which permits warrantless administrative inspections by troopers for purposes of determining a truck's compliance with these regulations.

A warrantless administrative inspection does not *per se* violate the Fourth Amendment.[2] *City of Los Angeles v. Patel*, 576 U.S. 409, 419–20 (2015). The Supreme Court has explained that "in 'closely regulated' industries—namely, those which have long been subject to close supervision and inspection—the privacy interests of business owners may be so attenuated, and the government's interest in regulating the particular industry so strong, that a warrantless inspection of the commercial premises might be reasonable within the meaning of the Fourth Amendment." *Lesser v. Espy*, 34 F.3d 1301, 1305 (7th Cir. 1994) (discussing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313–14 (1978)). In these industries, an individual's "reasonable expectations of privacy are diminished because an individual who 'embarks upon such a business … has voluntarily chosen to subject himself to a full arsenal of governmental regulation.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S.*

---

[2] The history of the Fourth Amendment's warrant requirement does, however, provide insight into why the Framers looked skeptically upon warrantless searches and seizures. Indeed, "[i]t is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). "The Fourth Amendment's commands grew in large measure out of the colonists' experience with the writs of assistance that granted sweeping power to customs officials and other agents of the King to search at large for smuggled goods." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311 (1978) (citation modified).

*Dep't of Transp.*, 840 F.3d 879, 893 (7th Cir. 2016) (quoting *Marshall*, 436 U.S. at 313).

Thus, "unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Donovan v. Dewey*, 452 U.S. 594, 598 (1981) (citing *United States v. Biswell*, 406 U.S. 311 (1972), and *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970)). These regulatory schemes can be permissible under the Fourth Amendment when the government's regulation of that industry is "pervasive." *New York v. Burger*, 482 U.S. 691, 700–02 (1987). We have held that the commercial trucking industry is a pervasively regulated industry. *Owner-Operator Indep. Drivers Ass'n*, 840 F.3d at 893.

The Fourth Amendment, though, still imposes constraints on warrantless inspections in pervasively regulated industries, *see Burger*, 482 U.S. at 699–703, so these inspections "must still be reasonable," *Owner-Operator Indep. Drivers Ass'n*, 840 F.3d at 893 (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Importantly, an administrative inspection must not be used as pretext for gathering evidence of criminal activity. *Whren*, 517 U.S. at 811 (citing *Burger*, 482 U.S. at 716–17 n.27). An administrative inspection, unlike penal laws, serves a primary purpose distinguishable from a government's general interest in crime control. *See Patel*, 576 U.S. at 420. Thus, in the context of warrantless administrative inspections, an officer's subjective intent may factor into whether the inspection was pretextual. Indeed, an officer's "actual motivations" for conducting the inspection can invalidate the of-

ficer's otherwise objectively justifiable behavior. *al-Kidd*, 563 U.S. at 736 (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001)).

Put differently, the administrative inspection context is one of two limited exceptions where the Supreme Court has recognized that officers' "actual motivations" do matter. *Id.* (quoting *Knights*, 534 U.S. at 122).[3]

That recognition takes root in decades of Supreme Court precedent. In *Whren*, for example, the Court explained that it has "never held, *outside the context of inventory search or administrative inspection* … , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment."[4] 517 U.S. at 812 (emphasis added). The administrative inspection case on which the Court relied for this proposition was

---

[3] The other exception recognized by the Supreme Court is the "special needs" doctrine. "A judicial warrant and probable cause are not needed where [a] search or seizure is justified by special needs, beyond the normal need for law enforcement, such as the need to deter drug use in public schools, or the need to ensure that railroad employees engaged in train operations are not under the influence of drugs or alcohol; and where the search or seizure is in execution of an administrative warrant authorizing, for example, an inspection of fire-damaged premises to determine the cause, or an inspection of residential premises to ensure compliance with a housing code." *al-Kidd*, 563 U.S. at 736 (citation modified).

[4] "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren*, 517 U.S. at 811 n.1 (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). In the inventory search context, courts assess whether officers followed "standardized procedures" and whether they "acted in bad faith or for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

*New York v. Burger*. There, the Supreme Court developed a test to assess the "reasonableness" of warrantless administrative inspection schemes, and in that case, upheld an administrative scheme in New York regulating automobile junkyards.[5] *Burger*, 482 U.S. at 708.

In doing so, the Court also evaluated pretext on two levels. *Id.* at 716–17 n.27. First, it concluded "the New York Legislature had proper regulatory purposes for enacting the administrative scheme and was not using it as a 'pretext' to enable law enforcement authorities to gather evidence of penal law violations." *Id.* At the second level, the Court evaluated whether the officers' administrative inspection was "truly" made pursuant to the administrative scheme. The Supreme Court noted there was "no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws. It is undisputed that the inspection was made solely pursuant to the administrative scheme." *Id.*

The throughline of these cases is the Supreme Court's concern that administrative inspections will be used as a pretext to investigate criminal activity. Given that concern, it makes sense that courts can interrogate an individual officer's purpose for undertaking a warrantless administrative inspection. *See al-Kidd*, 563 U.S. at 736–37.

---

[5] *Burger*'s three-part test assesses: (1) whether a substantial government interest informs the regulatory scheme; (2) whether warrantless inspections are necessary to further the regulatory scheme; and (3) whether the scheme affords a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 702–03.

That conclusion finds further support in many of our sister circuits' decisions. *See, e.g.*, *United States v. Orozco*, 858 F.3d 1204, 1206 (9th Cir. 2017) (holding, in a case posing nearly identical factual circumstances, that "it does not matter that the Nevada administrative scheme was valid on its face, where the objective evidence … establishes beyond doubt that this stop was a pretext for a stop to investigate information of suspected criminal activity short of that necessary to give rise to reasonable suspicion"); *Bruce v. Beary*, 498 F.3d 1232, 1239, 1242–43 & n.19 (11th Cir. 2007) (observing *Burger* "rejected the idea that an administrative inspection may be used to gather evidence as part of what is, in reality, a criminal investigation," and noting officer's testimony about his intent could be "evidence of illegal pretext" (citing *Burger*, 482 U.S. at 691, 716 n.27)); *United States v. Johnson*, 994 F.2d 740, 742 (10th Cir. 1993) (an administrative inspection is a sham where it is "a pretext solely to gather evidence of criminal activity"); *cf. United States v. Johnson*, 889 F.3d 1120, 1135–36 (9th Cir. 2018) (Paez, J., concurring) (collecting cases from six circuits showing "a police officer's subjective motive is relevant" in assessing an inventory search's constitutionality).

In short, when assessing the second level of the *Burger* pretext inquiry, if there's sufficient evidence that an officer's purpose for undertaking the administrative inspection is not to "further the regulatory scheme," but pretext for the sole purpose of investigating criminal activity, then the administrative inspection exception to the warrant requirement would not apply. *Burger*, 482 U.S. at 702, 716–17 n.27 (citation modified).

The government resists this conclusion, arguing that two Supreme Court cases foreclose an officer-level pretext inquiry.

The first is *City of Indianapolis v. Edmond*, where the Supreme Court held that the Indianapolis narcotics checkpoint program allowing police to stop cars without some measure of individualized suspicion violated the Fourth Amendment. 531 U.S. at 34, 48. Looking to the programmatic purpose, the Court concluded the primary purpose of the Indianapolis checkpoint program was to uncover evidence of ordinary criminal activity without any indicia of individualized wrongdoing, which contravened the protections of the Fourth Amendment. *Id.* at 40–42. Distinguishing the unconstitutional narcotic-checkpoint program from the traffic stop in *Whren*, the Court explained that "an individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred." *Id.* at 45 (citing *Whren*, 517 U.S. at 813). Turning back to the facts of the narcotics-checkpoint program, the Court then warned that inquiries into the purpose of these checkpoints should "be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene." *Id.* at 48 (citing *Whren*, 517 U.S. at 813).

Then in *Brigham City v. Stuart*, the second case offered by the government, the Supreme Court built upon *Edmond*'s warning and held that an officer's subjective intent is irrelevant to determining whether the warrant requirement's exigency exception applies. 547 U.S. at 404–05. In doing so, the Court drew a contrast with the programmatic inquiry ap-

proved by *Edmond*, explaining that this inquiry also "has nothing to do with discerning what is in the mind of the individual officer conducting the search." *Id.* at 405 (citing *Edmond*, 531 U.S. at 44).

In light of *Edmond* and *Brigham City*, the government, in essence, argues that where the Supreme Court has permitted "purpose" inquiries, that permission is limited to the "programmatic" level and not the subjective intent of the officers. Relying on these two cases and extrapolating to the administrative inspection context, the government contends Muzzillo's "subjective" motivation for conducting the administrative inspection is irrelevant. But that contention is misplaced. *Edmond* and *Brigham City* did not involve special-needs or administrative inspections, both of which are "limited exceptions" to the Fourth Amendment's objective reasonableness inquiry. *al-Kidd*, 563 U.S. at 736 (citation modified).

*Edmond* was, at bottom, a checkpoint case divorced from policing the border or the necessity of ensuring roadway safety. The Court found the narcotics-checkpoint program violated the Fourth Amendment. *Edmond*, 531 U.S. at 48. Much of the Court's reasoning contrasted Indianapolis's drug-interdiction checkpoint with other fixed highway checkpoints with limited officer discretion previously approved by the Court. *Id.* at 40–44; *see United States v. Martinez-Fuerte*, 428 U.S. 543, 561–64 (1976) (checkpoint to intercept undocumented immigrants); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450–55 (1990) (checkpoint to combat drunk driving); *see also Prouse*, 440 U.S. at 663 (suggesting that the "[q]uestioning of all oncoming traffic at roadblock-type stops" to check motorists' driver's licenses and vehicle registrations may be permissible). The Court in *Edmond*

clarified that its holding did "nothing to alter the constitutional status of the sobriety and border checkpoints that [it] approved in *Sitz* and *Martinez-Fuerte*, or the type of traffic checkpoint that [it] suggested would be lawful in *Prouse*." 531 U.S. at 47.

Beyond that, the Court in *Edmond* went to great lengths to emphasize the limited reach of its reasoning:

> Our holding also does not affect the validity of border searches or searches at places like airports and government buildings, where the *need* for such measures to ensure public safety can be particularly acute. *Nor does our opinion speak to other intrusions aimed primarily at purposes beyond the general interest in crime control.* Our holding also does not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose. Finally, we caution that the purpose inquiry *in this context* is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene.

*Id.* at 47–48 (emphasis added).

As this shows, by its own terms *Edmond* was not a doctrinal sea change. Indeed, because that case didn't "speak to other intrusions aimed primarily at purposes beyond the general interest in crime control," *id.* at 48, it disclaimed any in-

tention to modify the Court's previous administrative inspection jurisprudence. And its admonition to conduct purpose inquiries at only the programmatic level was cabined to inquiries "in this context"—*i.e.*, in the context of assessing whether a vehicle checkpoint program's drug trafficking purpose is distinguishable from general crime control. *See id.*

*Brigham City* is even further afield from the administrative inspection context than criminal-checkpoint programs. In *Brigham City*, the Court was addressing the constitutional limits of the "exigent circumstances" warrant exception to the Fourth Amendment. In that case, the Supreme Court did not discuss or modify the "intent" inquiry of administrative inspections. *Brigham City*, 547 U.S. at 403. As the Court explains, in the context of exigent circumstances, the touchstone of the warrant exception to the Fourth Amendment is whether "the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable." *Id.* (citation omitted). The Court also went on to explain that when the nature of the "exigent circumstances" is challenged, the inquiry is objective and "has nothing to do with discerning what is in the mind of the individual officer conducting the search." *Id.* at 405 (citing *Edmond*, 531 U.S. at 48). *Brigham City* doesn't add anything new to the "pretext" detour of challenges to an administrative inspection.

So, when put in proper context, *Edmond* and *Brigham City* do not prohibit individual officer-level pretext inquiries in the limited area of administrative inspections. Without more specific guidance from the Supreme Court, it seems unlikely to us that those cases upended the Court's prior precedent permitting those inquiries. *See Whren*, 517 U.S. at 811–12; *Burger*, 482 U.S. at 702, 716–17 n.27.

Further support for that conclusion can be found in the Supreme Court's decisions after *Edmond* and *Brigham City*. These decisions continue to demonstrate the enduring vitality of officer-level pretext inquiries in "limited" circumstances. For example, the Court in *al-Kidd* reiterated that the administrative inspection context is an area where officers' "actual motivations" do matter. 563 U.S. at 736 (citation modified).

And the Court has pressed that same point in subsequent cases. *Kentucky v. King*, 563 U.S. 452, 464 (2011) ("Indeed, we have never held, outside limited contexts such as an 'inventory search or administrative inspection … , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'" (quoting *Whren*, 517 U.S. at 812, and then citing *Brigham City*, 547 U.S. at 405)); *Fernandez v. California*, 571 U.S. 292, 302 (2014) (quoting this passage from *King*). Put simply, we are not persuaded that *Edmond* or *Brigham City*—cases outside the administrative inspection context—modified the framework for assessing administrative inspections in the way the government contends.

The government also relies on *United States v. Villamonte-Marquez*, a case decided before *Burger*, for the proposition that an administrative inspection is not rendered unconstitutional simply because it is accompanied by some suspicion of wrongdoing. *See Villamonte-Marquez*, 462 U.S. at 584 n.3. But such reliance fails to account for crucial differences in the scheme at issue in *Villamonte-Marquez* and the unique interests at stake in the maritime context.

In *Villamonte-Marquez*, the Supreme Court considered the constitutionality of a federal statute permitting Customs officers to board seafaring vessels located in waters with ready access to the open seas and review those vessels' documenta-

tion without a warrant or suspicion of wrongdoing. *Id.* at 580–81. In answering this question, like its later analysis in *Edmond*, the Court assessed the "reasonableness" of the government's intrusion by balancing the individual's Fourth Amendment interests against the legitimate interests of the government. *Id.* at 588. Thus, to evaluate the statute's constitutionality, the Supreme Court addressed whether the Customs officers needed articulable suspicion to seize the vessel that is comparable to the suspicion required to stop automobiles on the public highways near the border. *Id.* Relying on factual differences between those two contexts, the Supreme Court concluded the Fourth Amendment's reasonableness inquiry demanded a different result.

The Supreme Court started by evaluating the government's interest in random maritime documentation checks. *Id.* at 589–91. The Court first observed the impracticality of establishing fixed checkpoints at various ports, explaining vessels coming from the open sea could evade those checkpoints and thereby reduce the government's ability to ensure compliance with its documentation laws. *Id.* at 589–90. Next, the Supreme Court highlighted the difficulty of determining a vessel's documentation compliance by merely examining its outward markings. *Id.* at 590. Then, the Supreme Court noted the panoply of complex statutes and regulations governing maritime documentation that served both public and governmental interests in numerous ways. *Id.* at 590–93. Some of these interests could be described as administrative, such as supporting the regulation of trades like "fishing, salvaging, towing, and dredging." *Id.* at 591. But these documentation laws also served other law enforcement purposes, like preventing the entry of "controlled substances, illegal aliens, prohibited medicines, adulterated foods, dangerous chemicals,

prohibited agricultural products, diseased or prohibited ani-
mals, and illegal weapons and explosives." *Id.* In other words,
these documentation laws furthered both administrative and
criminal enforcement interests in the maritime context. *Id.*

Recognizing the government's "substantial" interests in
random maritime documentation checks, the Supreme Court
next examined this intrusion on an individual's Fourth
Amendment interest. *Id.* at 592–93. In assessing their reason-
ableness, the Court observed these checks involved "only a
brief detention where officials come on board, visit public ar-
eas of the vessel, and inspect documents," resulting in a "lim-
ited" interruption. *Id.* at 592. The Court concluded this consti-
tuted only a modest intrusion. *Id.*

Balancing this modest intrusion against the government's
"substantial" interests, the Supreme Court upheld the statute
as constitutional under the Fourth Amendment. *Id.* at 593.
From that, the Supreme Court concluded the Customs offi-
cials' suspicionless stopping and boarding of the vessel pur-
suant to this federal statute was "reasonable" and not a viola-
tion of the Fourth Amendment. *Id.*

It's against this backdrop that the Supreme Court consid-
ered the defendants' alternative argument in *Villamonte-
Marquez*: the presence of state police and knowledge of a tip
that a vessel in the shipping channel was carrying drugs un-
dermined the Customs officers' legal justification for board-
ing the vessel. *Id.* at 584 n.3. The Supreme Court rejected that
argument, reasoning there's "little logic in sanctioning such
examinations of ordinary, unsuspect vessels but forbidding
them in the case of suspected smugglers." *Id.* (citation and
quotation omitted). We have previously echoed similar rea-

soning. *See United States v. Nechy*, 827 F.2d 1161, 1166–67 (7th Cir. 1987).

This is the portion of *Villamonte-Marquez* on which the government in this case relies. Such reliance, however, fails to account for the Supreme Court's finding in *Villamonte-Marquez* that the maritime documentation law at issue there provided the legal justification for the Customs officials' warrantless boarding of the vessel. And that justification, the Court explained, found support both in civil and criminal law enforcement purposes. *See Villamonte-Marquez*, 462 U.S. at 591.

Here, the government failed to present evidence that the Illinois administrative inspection program at issue serves to support the state's criminal investigatory interest. Indeed, there is no record support that this scheme was intended to support anything other than administrative, non-criminal interests. In this way, *Villamonte-Marquez* can be distinguished on the same basis as *Edmond* and *Brigham City*—the principles from those cases cannot be wrenched out of context and applied to regulatory schemes justified by different Fourth Amendment interests and furthering only non-criminal regulatory purposes. Rather, when the regulatory scheme at issue furthers only an administrative purpose, not a criminal investigatory one, an administrative inspection undertaken solely to investigate criminal activity does not further that regulatory scheme. *See Whren*, 517 U.S. at 811–12 ("[T]he exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes.").

An allegation that an officer abused such a scheme in this manner is, by another name, attacking that administrative inspection as pretextual. And given the risk of allowing administrative inspections to become a pretext for crime control, it makes sense why Martinez has asked us to focus on that question here. *Burger*, 482 U.S. at 716–17 n.27 (assessing whether "the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws"); *see also United States v. Knight*, 306 F.3d 534, 537 (8th Cir. 2002) (recognizing the danger of allowing administrative inspections to become "pretexts for 'crime control'" (quoting *Edmond*, 531 U.S. at 40)); *Bruce*, 498 F.3d at 1241 ("We share our sister circuits' concern that the administrative search exception not be allowed to swallow whole the Fourth Amendment." (citation omitted)); *United States v. Johnson*, 408 F.3d 1313, 1321 (10th Cir. 2005) (noting *Burger* "did not endorse a scheme that would allow a warrantless search based on recently discovered evidence that criminal activity had occurred" (citation omitted)).

We do not mean to say that pretext is irrelevant when an administrative scheme serves multiple goals. *See Burger*, 482 U.S. at 713–16 & n.27 (noting that inspection conducted pursuant to scheme serving administrative and penal ends was not pretextual). Instead, we merely observe that where an administrative scheme serves only non-criminal ends, an inspection under that scheme motivated only by the desire to find evidence of criminal activity is more obviously pretextual.

Applying these principles here, for the government to show Muzzillo's traffic stop was justified in its inception under the administrative inspection exception to the warrant re-

quirement, the government must demonstrate two things. *See United States v. Dixon*, 137 F.4th 592, 605 (7th Cir. 2025) (noting the government bears the burden of proving warrantless searches' reasonableness). First, it must show that the State's regulatory scheme is reasonable under *Burger*. And second, it must show that Muzzillo's purpose for undertaking the administrative inspection was not "pretext." If the government can prove both elements, then Muzzillo's stop was justified in its inception. But if Muzzillo's sole purpose for the traffic stop was to obtain evidence of Martinez's involvement in criminal activity, the Fourth Amendment's warrant exception for an administrative inspection would not apply. *Burger*, 482 U.S. at 716–17 n.27 (maintaining a pretextual administrative inspection isn't "truly" an administrative inspection). And because Muzzillo initiated the traffic stop without individualized suspicion of wrongdoing, it would follow that the stop was unreasonable and thus in violation of the Fourth Amendment.

    1.   *Constitutionality of the Illinois Administrative Inspection Statute*

The Illinois Motor Carrier Safety Law, 625 ILL. COMP. STAT. 5/18b-100 *et seq.*, regulates the operation of certain commercial vehicles, including semitrucks. This statute authorizes the Illinois State Police "to stop and inspect any commercial motor vehicle or driver at any time for the purpose of determining compliance" with the administrative inspection statutory scheme and its implementing regulations. 625 ILL. COMP. STAT. 5/18b-102(e); *see also id.* § 18b-101.

The statute's implementing regulations specify seven different "levels" of "commercial vehicle inspections." ILL.

ADMIN. CODE tit. 92 § 390.1020 (2016).[6] Each level allows for the administrative inspection of various items relating to the driver or her vehicle. *Id.* The levels vary in their intrusiveness. A Level 1 inspection, for example, calls for a review of the driver's records and a full safety inspection of her truck. *Id.* A Level 3 inspection, by contrast, is less intrusive and entails checking the driver's license, insurance and registration documents, and the truck's logbooks.

Martinez does not attack the constitutionality of Illinois's regulatory scheme permitting Illinois State Troopers to conduct administrative inspections of commercial vehicles. We therefore accept, without deciding, that the Illinois Motor Carrier Safety Law is reasonable under *Burger*.

### 2. *Pretextual Administrative Inspection*

Martinez maintains, however, that the traffic stop of his semitruck was never a routine administrative inspection, arguing instead that Muzzillo undertook the stop as a criminal investigation into a tip that Martinez was transporting narcotics. This appeal is a challenge to whether the stop was justified in its inception as a true administrative inspection. *See Burger*, 482 U.S. at 716–17 n.27. Martinez contends the troopers improperly used Illinois's motor vehicle regulatory scheme not for the dual purpose of conducting an administrative inspection with knowledge of the tip, *see Villamonte-Marquez*, 462 U.S. at 584 n.3, but *solely* as pretext to investigate criminal activity, *see Burger*, 482 U.S. at 716–17 n.27.

---

[6] The most recent version of this regulation was recodified under a different section number. *See* ILL. ADMIN. CODE tit. 92 § 3320.1020 (2025).

As explained above, we are not asked to answer whether Illinois's commercial trucking regulatory scheme permitted Muzzillo to conduct the Level 3 vehicle inspection. Instead, the question is whether the government exceeded this authority by utilizing this regulatory scheme to circumvent the Fourth Amendment's warrant requirement for criminal investigations. *See Patel*, 576 U.S. at 420 (the administrative inspection exception applies only "where the primary purpose of the searches is distinguishable from the general interest in crime control" (citation modified) (quoting *Edmond*, 531 U.S. at 44)). Put another way, the legality of Muzzillo's traffic stop of Martinez under the administrative inspection exception hinges on whether the stop was, in fact, pretextual.

Whether an administrative inspection is pretext for a criminal investigation is a factual question. *Johnson*, 994 F.2d at 743 (citing *Abel v. United States*, 362 U.S. 217, 225–30 (1960)); *see also Bruce*, 498 F.3d at 1242 n.19. "We review the record as a whole to determine whether the district court's apparent finding that the administrative search was not a pretext for a criminal investigation is supported by the evidence." *Johnson*, 994 F.2d at 743.

At the evidentiary hearing for the suppression motion, Muzzillo, a K9 handler, testified he was not on routine patrol the night of the stop. Instead, he was "called out to assist" another law enforcement agency with a tip that Martinez was hauling a large quantity of drugs in his semitruck. From there, Muzzillo enlisted support from Krol, another K9 trooper, and they waited for at least thirty minutes in the middle of the night in search of Martinez's truck. Upon locating the vehicle around 3 a.m., Muzzillo initiated the administrative inspection and conducted a dog sniff around the semitruck. After

the K9 alerted for drugs, a member of the law enforcement agency that provided the tip asked Muzzillo to search Martinez's semitruck. The search yielded narcotics, and Muzzillo handed the criminal investigation off to that agency member. These circumstances, viewed in their totality, reveal a coordinated law enforcement operation: two K9 handlers called out for a middle-of-the-night stakeout to assist in investigating a narcotics tip at the behest of another law enforcement agency.

Muzzillo's testimony at the suppression hearing lends further support for that conclusion. Muzzillo testified that he stopped Martinez's semitruck because he "had received information" from another law enforcement agency that the semitruck "was possibly carrying large-load narcotics." Nothing in the record suggests Muzzillo would have been out on patrol—let alone have stopped Martinez—but for the other law enforcement agency's tip.

Taking the stop's circumstances and Muzzillo's admission together, the record shows that Muzzillo's sole motivation for stopping Martinez was to further a criminal investigation, not Illinois's regulatory scheme.

Moreover, at no point has the government presented any evidence or testimony identifying the administrative purpose of the traffic stop. Both at the hearing and on appeal, the government has yet to present any delineation between the criminal investigation and the alleged state regulatory inspection. It has also failed to mitigate the significance of a K9 officer, not on routine patrol, called in to assist with an administrative inspection before the crack of dawn. *See Bruce*, 498 F.3d at 1244 ("Although a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not."). Respectfully, the dissent does not grap-

ple with the government's failure to meet this burden. There has been no presentation by the government to establish that Muzzillo's stop was not pretextual.

In sum, the government has not met its burden of demonstrating that Muzzillo's stop was justified in its inception. *Dixon*, 137 F.4th at 605. The record evidence, when viewed as a whole, demonstrates that Muzzillo used the authority granted by Illinois's administrative inspection scheme solely as a tool to bypass the Fourth Amendment's warrant requirement and to further a criminal investigation. Put simply, Muzzillo engaged in a pretextual administrative inspection. The district court's apparent finding to the contrary was clearly erroneous. *See United States v. Outland*, 993 F.3d 1017, 1022 (7th Cir. 2021) (assessing whether district court "necessarily or implicitly" made a factual determination when denying suppression motion).

And because the factual finding of pretext requires "the legal conclusion of unconstitutional unreasonableness," *Bruce*, 498 F.3d at 1242 n.19, the drug evidence obtained as the fruit of Muzzillo's stop must be suppressed unless an exception to the Fourth Amendment's exclusionary rule applies.

### B. Exclusionary Rule

The government argues that even if Muzzillo's pretextual administrative inspection violated Martinez's Fourth Amendment rights, the evidence seized from the search that followed still should not be suppressed under the exclusionary rule. That's because, the government contends, Muzzillo relied in good faith on Illinois's administrative inspection scheme and on binding appellate precedent when he decided to initiate the stop.

Although the government raised this argument below, the district court did not address it. But because we review de novo the legal determination of whether the exclusionary rule applies, *United States v. Hueston*, 90 F.4th 897, 902 (7th Cir. 2024), we can make that determination ourselves on the record before us, *see United States v. Reyna*, 165 F.4th 1056, 1060, 1062–65 (7th Cir. 2026) (concluding parties' briefing supplied adequate record to decide legal question not answered by district court); *cf. Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (resolving whether contract existed between parties because we review that issue de novo and "the record contain[ed] enough information to permit a decision" on the issue).

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands[.]" *United States v. Leon*, 468 U.S. 897, 906 (1984). But to "compel respect for the constitutional guaranty" offered by the Fourth Amendment, the Supreme Court created the exclusionary rule. *Davis v. United States*, 564 U.S. 229, 236 (2011) (citations omitted). "A defendant may invoke the rule to prevent tainted evidence from being used against him at trial, but the exclusionary rule is not a personal constitutional right, and its application exacts a heavy toll on both the judicial system and society at large." *United States v. Felton*, 159 F.4th 1128, 1135 (7th Cir. 2025) (citation omitted). That's why the exclusionary rule requires suppression of evidence seized in violation of the Fourth Amendment only if suppression's deterrence benefits outweigh its substantial social costs. *Davis*, 564 U.S. at 237.

The Supreme Court, in a line of cases beginning with *United States v. Leon*, has calibrated its "cost-benefit analysis

in exclusion cases to focus the inquiry on the 'flagrancy of the police misconduct' at issue" under what's known as the good faith exception to the exclusionary rule. *Id.* at 238 (quoting *Leon*, 468 U.S. at 909, 911). "The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue." *Id.* (citation modified) (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)). The "deterrence rationale loses much of its force," and thus "exclusion cannot 'pay its way,'" *id.* (citation modified) (quoting *Leon*, 468 U.S. at 908 n.6, 919), when, for example, "the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," *id.* (citation modified) (citing *Leon*, 468 U.S. at 909, and *Herring*, 555 U.S. at 137). But "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). *Leon* and its progeny demonstrate how "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges." *Leon*, 468 U.S. at 916.

And as the Supreme Court has expanded the good faith exception to other contexts since *Leon*, those cases "have sounded a similar theme." *Davis*, 564 U.S. at 239. For example, in *Illinois v. Krull*, the Court applied the good faith exception to warrantless administrative inspections conducted by officers reasonably relying on legislative statutes later invalidated, reasoning that "legislators, like judicial officers, are not the focus of the [exclusionary] rule." 480 U.S. 340, 350 (1987). And more recently in *Davis*, the Court applied the good faith exception to searches conducted in reasonable reliance on binding appellate precedent that is later overturned, reasoning an

officer conducting such a search "does no more than act as a reasonable officer would and should act under the circumstances." 564 U.S. at 241 (citation modified).

The government, relying on *Krull*, argues Muzzillo was entitled to rely on Illinois's administrative scheme. The Supreme Court applied the good faith exception in *Krull* because excluding evidence "obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant." 480 U.S. at 349. The primary purpose of the judicially developed exclusionary rule was always to deter future police misconduct, not penalize officers for a magistrate or legislature's mistake. *Id.* at 350. *Krull* has little force here, where, as discussed above, Muzzillo undertook the administrative inspection as pretext for an ongoing drug investigation. Put another way, the relevant actors here are not Illinois legislators, but police officers like Muzzillo "who concededly are 'engaged in the often competitive enterprise of ferreting out crime.'" *Id.* at 360 n.17 (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).[7]

The government failed to sufficiently rebut the conclusion that Muzzillo initiated the traffic stop with the sole purpose of furthering a criminal investigation. *Cf. Leon*, 468 U.S. at 915 n.13 (observing officers' good faith reliance must be tested ob-

---

[7] This is also why the Court in *Krull* declined "to recognize an exception for an officer who erroneously, but in good faith, believes he is acting within the scope of a statute." 480 U.S. at 360 n.17. The Court reasoned that such an exception "does not follow inexorably from" its holding in that case, as the inquiry required for such an exception would center on the action of officers, not legislators or magistrates. *Id.*

jectively to adequately guard against police abuse of discretion). It could have offered numerous types of evidence to do this. For example, the government offered no evidence that this stretch of highway commonly presented safety concerns for semitrucks or other motorists. Nor did the government demonstrate that it was routine for law enforcement to use K9 officers to conduct middle-of-the-night administrative inspections. To fit within *Krull*, the government had to demonstrate that suppression stood only to punish Muzzillo for the mistake of legislators. It didn't do so. Given that, the benefits of deterring future police misconduct under these circumstances remain strong.

The government also argues that under *Davis*, Muzzillo was entitled to rely on binding appellate precedent. That argument, however, stumbles out of the gate. *Davis* guards against punishing officers for following "binding appellate precedent [that] specifically authorizes a particular police practice" and that precedent is overturned after the fact. 564 U.S. at 241 (emphasis omitted). But *Davis* also observed that "[r]esponsible law enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules." *Id.* (citation modified). As detailed above, decades of Supreme Court precedent has required officers to undertake warrantless administrative inspections in furtherance of the administrative scheme, not as a pretext for criminal investigation. *See, e.g., al-Kidd*, 563 U.S. at 736; *Whren*, 517 U.S. at 811–12; *Burger*, 482 U.S. at 702, 716–17 n.27. That's why *Davis* offers no safe harbor to the government here—the good faith exception does not shield officers from the consequences of ignoring longstanding, binding precedent.

Finally, the government argues that even if the exclusionary rule applies here, the proper remedy would be to remand for another hearing to flesh out testimony about the pretextual nature of Muzzillo's actions. But we decline the government's invitation. As discussed above, the record before us was adequate to determine that the district court clearly erred in its apparent finding that Muzzillo didn't engage in a pretextual administrative inspection. *Compare United States v. Combs*, 222 F.3d 353, 362 (7th Cir. 2000) (explicit finding that police read suspect his *Miranda* rights not required where such a finding was implicit in court's order), *with Outland*, 993 F.3d at 1023 (remanding because district court made no determination about *Miranda* rights waiver). And to the extent the record could have been more developed on this point, the government shoulders the blame for that lack of development. This is because it argued both in its suppression motion papers and at the suppression hearing that Muzzillo's traffic stop was justified at its inception, regardless of whether Muzzillo harbored a pretextual subjective intent. That this argument was incorrect does not justify giving the government a second chance to contest Martinez's suppression motion.

Taken all together, the good faith exception to the exclusionary rule does not apply here. That means the evidence seized without a warrant due to Muzzillo's unlawful pretextual administrative inspection must be suppressed.

### III.   CONCLUSION

For these reasons, we REVERSE the denial of the suppression motion and REMAND for proceedings consistent with this opinion.

KIRSCH, *Circuit Judge*, dissenting. I disagree with my colleagues that the evidence seized by Trooper Anthony Muzzillo should be suppressed. That Trooper Muzzillo followed a tip from another law enforcement agency does not make an otherwise objectively reasonable seizure pursuant to a valid administrative scheme unconstitutional. And because there are no other reasons to exclude the cocaine seized by Trooper Muzzillo, I respectfully dissent.

I

Illinois State Police Trooper Anthony Muzzillo received a tip from another law enforcement agency that a semitruck might be transporting a large quantity of narcotics, so he drove down the interstate to intercept the truck. At 3:16 am, he pulled the truck over to perform a Level III regulatory inspection, also sometimes called a paper inspection, under 625 Ill. Comp. Stat. 5/18b-102(e). That statute allows officers to "stop and inspect any commercial motor vehicle or driver at any time for the purpose of determining compliance with" the regulatory scheme. *Id.* Inspections involve examining the driver's commercial driver's license, insurance and registration documents, and logbooks, which record the vehicle's path, drive time, and rest time.

Trooper Muzzillo approached the cab, where he found Ausencio Martinez. Trooper Muzzillo immediately confronted what he described as the "overwhelming odor of air freshener." He requested Martinez's papers and that Martinez join him in his squad car while he inspected them. Martinez agreed.

During the paper inspection, Trooper Muzzillo noticed anomalies. For one, Martinez seemed extremely nervous.

And the logbooks showed that Martinez had taken a long detour; though he was hauling air filters from Texas to Illinois, Martinez had driven 300 to 400 miles out of his way to the area near Nashville, Tennessee. Martinez justified his aberrant path by explaining that his company had rerouted him and then changed its mind. Lastly, though the truck's bill of lading said that the load had been sealed, when Trooper Muzzillo went to the back of the truck to confirm the serial number from the bill of lading, he saw the seal had been removed, contrary to typical practice.

At this point, Trooper Muzzillo prolonged the stop to conduct a dog sniff. He asked Martinez for permission to do so, and the district court determined that Martinez consented. As Trooper Muzzillo walked his dog Maverick around the driver's door, Maverick alerted. As a result, Trooper Muzzillo searched the cab, where he found 15 kilograms of cocaine inside a black duffel bag.

A grand jury charged Martinez with possessing five or more kilograms of cocaine with an intent to distribute in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A). Martinez moved to suppress the evidence. He did not dispute that the law authorized an administrative inspection, though he argued that Trooper Muzzillo's stop was unlawfully pretextual. He also argued that Trooper Muzzillo lacked individualized suspicion, lacked reasonable suspicion to prolong the inspection with a dog sniff, and that the dog's alert did not provide probable cause to search the truck.

At the suppression hearing, Trooper Muzzillo repeated what he had written in his police report: that the administrative inspection was "the reason … for the stop." And Trooper Muzzillo explained that he selected Martinez's truck because

he had received information that the truck was "possibly carrying large-load narcotics."

The district court rejected Martinez's arguments and denied the motion to suppress. Martinez pled guilty but reserved the right to appeal the denial of his motion. He received the mandatory minimum sentence of ten years in prison. Martinez appealed, and my colleagues are persuaded by the arguments the district court rejected.

## II

My colleagues say that Trooper Muzzillo's administrative inspection was invalid because he was acting on a tip and because he conducted the inspection under 625 Ill. Comp. Stat. 5/18b-102(e), which supposedly has no criminal investigatory or deterrent purpose. Yet as I explain below, that Trooper Muzzillo was acting on a tip—his ulterior motive for the administrative inspection—does not make the search unreasonable under the Fourth Amendment. And the purpose of an administrative program such as 625 Ill. Comp. Stat. 5/18b-102(e) is relevant only to determine the permissibility of the administrative program, not to whether Trooper Muzzillo's subjective motivation for the search rendered it unconstitutional.

## A

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. To uphold that right, the Supreme Court has held that generally, evidence generated from an unreasonable search "shall not be used at all." *Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). Typically, when police don't obtain a valid warrant from a neutral magistrate,

searches and seizures are "per se unreasonable." *Robbins v. California*, 453 U.S. 420, 423 (1981). But there are "a few specifically established and well-delineated exceptions" to the general warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). Pertinent to this case, government officials can conduct warrantless administrative inspections of pervasively regulated businesses or industries like commercial trucking. *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 893 (7th Cir. 2016). That's because when it comes to pervasively regulated businesses, "the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened." *New York v. Burger*, 482 U.S. 691, 702 (1987).

Courts are rightfully wary of allowing administrative inspections to morph into the kinds of general warrants that our Founders forcefully opposed. See *Payton v. New York*, 445 U.S. 573, 583 (1980); *Abel v. United States*, 362 U.S. 217, 226 (1960) ("The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts."). Consequently, the Fourth Amendment protects against administrative inspections conducted for invalid purposes. See *City of Indianapolis v. Edmond*, 531 U.S. 32, 45–46 (2000). As my colleagues explain, there are two levels at which we might conduct the purpose inquiry: the programmatic level and the individual officer level. Martinez never challenged Illinois's regulatory scheme, so he waived any argument about its constitutionality. See *United States v. Waldrip*, 859 F.3d 446, 449 (7th Cir. 2017). As for the individual officer inquiry, the majority asserts that Supreme Court cases, primarily *Burger* and *Whren v. United States*, 517 U.S. 806 (1996), instruct us to examine the subjective purpose of the officer on the scene. And

my colleagues write extensively about how two other cases, *Edmond* and *Brigham City v. Stuart*, 547 U.S. 398 (2006), do not foreclose that officer-level inquiry. There is at least some reason to think that they are mistaken: in *United States v. Johnson*, 889 F.3d 1120 (9th Cir. 2018), for instance, a majority of the panel read *Edmond* and *Brigham City* to say that "an individual officer's subjective motivation is irrelevant to the Fourth Amendment, even when the programmatic motivation behind an administrative scheme might matter." *Id.* at 1130 (O'Scannlain & Bea, JJ., concurring) (per curiam). But I need not address any dispute about what *Edmond* and *Brigham City* say, because even if the majority is right that we must consider the individual officer's subjective purpose, the sole purpose test it proposes is satisfied here.

My colleagues say that an officer's subjective purpose for conducting an administrative inspection can invalidate the inspection only if the officer's sole purpose was impermissible (such as to investigate crime). In such contexts, searches and seizures are subject to the normal Fourth Amendment rules. That means, according to my colleagues' test, that if there is at least one legal purpose for a seizure made pursuant to an administrative inspection, the officer's ulterior motive doesn't matter. Their test is satisfied here. Trooper Muzzillo didn't act with the sole purpose of criminal investigation. Furthermore, I see no basis for the majority's conclusion that the purpose of the administrative scheme is relevant to our evaluation of an officer's ulterior motive.

The district court did not clearly err in finding that Trooper Muzzillo had more than one purpose for the stop. He sought to follow up on the tip, as the majority emphasizes, but also to conduct a Level III inspection. Trooper Muzzillo's

assertions, his behavior, and the discretion afforded to him by the Illinois statute (which is not contested) all support that he had more than one purpose for the seizure. First, he asserted a legal purpose for conducting the inspection. In his investigative report, Trooper Muzzillo specified that the purpose of the stop was to conduct a Level III commercial motor vehicle inspection. And at the suppression hearing, Trooper Muzzillo stated that the Level III inspection was "the reason, again, for the stop." Second, his behavior suggests that the purpose of his stop was at least partially to legally conduct a Level III inspection. He actually carried out that inspection and did so adhering to proper procedure. See *Colorado v. Bertine*, 479 U.S. 367, 375 (1987) (emphasizing the importance of standardized procedures to the administrative inspection analysis). Indeed, Trooper Muzzillo would have only looked at Martinez's logbooks for the purpose of performing a Level III inspection. And he didn't proceed beyond the paper inspection until he had developed more than sufficient suspicion to do so. Third, it is uncontested that the statute allowed Trooper Muzzillo to stop Martinez and search his papers since Martinez was operating a commercial motor vehicle. Therefore Trooper Muzzillo, by his affirmations, his actions, and the statute's text, had a valid administrative purpose distinct from his criminal investigatory motive. Surely Trooper Muzzillo was motivated to find what he described as "[t]he possibility of contraband." But that was his primary, not his sole, purpose.

We need only look at *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983) to see how thin an officer's administrative purpose may be without impacting the inspection's constitutionality. That case concerned an administrative inspection of a sailboat. *Id.* at 584 n.3. Customs officers, "accompanied by a Louisiana State Policeman," were "following an informant's

tip that a vessel in the ship channel was thought to be carrying marijuana," when they approached a sailboat rocking in another ship's wake and asked if the sailboat and crew were all right. *Id.* at 582–84 & n.3. After a man on the deck "shrugged his shoulders in an unresponsive manner," the officers boarded the sailboat "and asked to see the vessel's documentation." *Id.* at 583.

The defendants argued that the authorizing statute could not have sustained the inspection because, among other reasons, the search followed an informant's tip—that is to say, because it was pretextual. *Id.* at 584 n.3. And in fact, the officers did have ulterior motives: as the Fifth Circuit made clear, the officers targeted the boat for a search precisely because an informant had told them that "there were two loads of marijuana on two separate vessels" on their way to Louisiana. *United States v. Villamonte-Marquez*, 652 F.2d 481, 482 (5th Cir. 1981).

But the Supreme Court focused only on the fact that the officers boarded the sailboat "to see the vessel's documentation." *Villamonte-Marquez*, 462 U.S. at 583. The statute was enough to justify the inspection when the officers conducted it according to procedure, and the officers' ulterior motive did not strip them of their administrative authority to do so. See *Whren*, 517 U.S. at 811–12. The Supreme Court emphasized "[w]e would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers." *Villamonte-Marquez*, 462 U.S. at 584 n.3 (quoting *United States v. Arra*, 630 F.2d 836, 846 (1st Cir. 1980)); see also *United States v. Nechy*, 827 F.2d 1161, 1167 (7th Cir. 1987) ("[I]t does rather turn the Fourth Amendment on its head to complain about not the dearth but the plethora of

grounds for believing that a [highly regulated business] that is to be inspected is involved in criminal activity.").

My colleagues appear to concede that the officers in *Villamonte-Marquez* acted with the same ulterior motive as did Trooper Muzzillo. They nonetheless attempt to write around *Villamonte-Marquez*, highlighting that in that case the statute had a criminal deterrent purpose and reasoning that "where an administrative scheme serves only non-criminal ends, an inspection under that scheme motivated only by the desire to find evidence of criminal activity is more obviously pretextual." *Ante* at 20. But that does not distinguish this case. The Court's conclusion that the search was not pretextual was not related to the authorizing statute's criminal deterrent purpose; rather, the search wasn't pretextual because the officers actually conducted a document inspection as permitted by the statute. See *Villamonte-Marquez*, 462 U.S. at 583, 585.

The same is true in *Burger*.* In that case, the state conceded that it chose to search a junk yard to look for evidence of crime. *People v. Burger*, 493 N.E.2d 926, 930 (N.Y. 1986). But the Court nevertheless held that there was "no reason" to think that the inspection was pretextual because the officers conducted the search according to procedure. See *Burger*, 482 U.S. at 716–17 n.27 (referencing footnote 7 in the same opinion

---

* The majority emphasizes that *Burger* was decided after *Villamonte-Marquez* to distinguish *Villamonte-Marquez*. See *ante* at 16. But my colleagues seem to ignore that *Whren* was decided after *Burger*, and *Whren* reaffirmed that in *Villamonte-Marquez*, the Supreme Court "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification." *Whren*, 517 U.S. at 812. And, as I'll explain, *Burger* supports my position.

to show that a warrantless administrative inspection is illegal pretext when the officers could not have possibly relied on the authorizing statute).

Just so here. We know why Trooper Muzzillo chose to conduct an administrative inspection of Martinez's truck. But we also know from *Villamonte-Marquez* and *Burger* that his ulterior motive for stopping the vehicle is not enough to invalidate the inspection because he was authorized to conduct the inspection and followed the proper procedure.

There's another reason that the majority's attempt to distinguish this case from Supreme Court precedent on the ground that the statutes in those cases were meant to deter crime is problematic: it ignores the Court's warnings. Time and time again, the Court has warned about the encroachment of administrative inspection exceptions on Fourth Amendment protections. See, e.g., *Abel*, 362 U.S. at 226. The majority concludes that individuals have less protection under the Fourth Amendment if the law authorizing a warrantless administrative inspection is designed to further the state's criminal investigatory or deterrent interest than if it isn't.

We do not know on this record whether the Illinois statute was meant to deter crime (although it probably was, at least in part). The majority faults the government, claiming that it "failed to present evidence that the Illinois administrative inspection program at issue serves to support the state's criminal investigatory interest." *Ante* at 19. But the government had no reason to present such evidence: it could not have anticipated the majority's test, and the purpose of the Illinois administrative scheme was not at issue. To the extent that the purpose of the administrative scheme matters, it would be to

determine the scheme's constitutionality, but Martinez did not challenge that. There was simply no reason for the government to have submitted any of the evidence that the majority faults it for omitting.

In *Nechy*, we warned that because the motive to gather criminal evidence "will always be present" in any search, arguments about an officer's subjective purpose are "disguised attacks on the constitutionality" of the underlying administrative regime. 827 F.2d at 1166. Here, the majority's ruling is an example of that. The majority suggests that if the government had established that the purpose of the Illinois administrative scheme was in part to support the state's criminal investigatory purpose, then Trooper Muzzillo's pretextual search would have passed constitutional muster under *Villamonte-Marquez*. But as far as the Fourth Amendment is concerned, the program's purpose does not inform whether an officer may act with ulterior motives.

B

After finding the stop unconstitutional based on Trooper Muzzillo's subjective motivations, the majority ended its analysis. But the initial stop was only the first step. The remaining ones were plainly constitutional. Based on the logbooks showing the truck had diverted hundreds of miles from its original route, the overwhelming smell of air freshener, Martinez's nervousness, and the missing trailer seal, Trooper Muzzillo developed reasonable suspicion to prolong the stop and walk Maverick around the truck. And only then, after the dog alerted, did Trooper Muzzillo search the cab. During that search, which Martinez doesn't contest on appeal, Trooper Muzzillo found the duffel bag with 15 kilograms of cocaine.

Because I do not think any part of the search and seizure was unconstitutional, I dissent.